GANDY v. STATE.

(In Banc. Dec. 6, 1943.)

[15 So. (2d) 685. No. 35294.]

McNeil, Jones & Zama and **J. H. Garth**, all of Hazle-hurst, for appellant.

Greek L. Rice, Attorney-General, by **R. O. Arrington**, Assistant Attorney-General, for appellee.

McGehee, J., delivered the opinion of the court.

The appellant Jim Gandy was convicted of manslaughter and sentenced to serve a term in the state penitentiary for the slaying of Marshall Rials. The only eye-witnesses to the homicide were the defendant and his son, who testified to the facts and circumstances in support of the defendant's plea of self-defense.

On the morning of the killing the defendant and his son had carried a truck load of seed cotton to Furr

Brothers Gin near Hazlehurst to have the same ginned. While the cotton was being unloaded from their truck on a platform and elevated into the gin stands, the deceased, in company with his wife, drove up in their truck with a bale of cotton and stopped the same about thirty feet from the gin-house and on the driveway behind the truck of the defendant, with one other truck between them. Thereupon the deceased got out of his truck, went to the east and nearest end of the gin-house and stood around there a few minutes near the truck of the defendant where he had opportunity to see and recognize the defendant and his son, with whom he was on unfriendly terms. He then returned to his truck where he got something and put it in his bosom. In the meantime the defendant had completed the unloading of his cotton through the elevator and into the gin stands and had driven forward alongside of the cotton loading platform at the extreme west end of the gin-house, which house was eighty feet in length, for the purpose of loading the ginned cotton onto his truck. He climbed upon the platform and entered the press room to get his gin ticket, and from which position he saw the deceased coming up a stairway on the inside of the gin-house and which led into the press room. Thereupon the defendant ran out onto the platform, jumped into his truck and immediately onto the ground in time to get his shotgun from the seat of his truck while the deceased was coming out onto the platform from in the press room with his loaded pistol in his hand, and then stopping between two bales of cotton. As the defendant jumped into his truck from the platform he called to his son and said, ''Look out, there comes Marshall and he has his gun.'' The son ''ducked'' behind the truck, but saw his father shoot the deceased as the latter was raising his pistol to shoot, and the deceased had stated as the defendant jumped in the truck from the platform, ''You God damn son of a bitch, I am going to get even with you this morning,'' at a time when he could see that the defendant then had no weapon

in his hand, and from which threat, without immediate action on the part of the deceased to carry it out, it would appear that he did not anticipate that the defendant, when jumping to the ground would be able to seize his own shotgun from under a cloth on the seat of his truck and become so quickly prepared to defend himself.

A loaded pistol was found at the side of the body of the deceased, and his wife testified that while she did not see the shooting she heard the shot fire after her husband had left their truck and within about the time it was shown by the other evidence in the case he could have gone through the entire gin-house and reached the platform where he knew that the defendant would necessarily go to load his bale of cotton on the truck.

It was shown by the proprietor of the gin that the deceased had no occasion to go through the press room and onto the edge of the platform so far as his business at the gin called him there, since his own cotton had not then been unloaded or ginned. The only reasonable inference is that he left his truck, went through the entire length of the gin, climbing a flight of stairs, and passed through the press room, across the cotton scales on which a bale was being weighed, and out to the platform with the intention of encountering the defendant and having a difficulty with him, and that he was armed for that purpose.

Written statements were taken from the defendant and his son on the day of the homicide and before they had been afforded an opportunity to confer with each other or with an attorney, and these statements were offered in evidence by the defendant, after the witnesses had been questioned by the district attorney in regard thereto, and they were consistent in all material particulars with the version given by the defendant and his son on the trial. Their testimony as to the relative positions of the two men when the shot was fired was thoroughly corroborated by other evidence. Their account of the killing having been reasonable and uncontradicted by any

other witness and being consistent with the physical facts, we are of the opinion that the defendant was entitled to a directed verdict in his favor as requested. Houston v. State, 117 Miss. 311, 78 So. 182; Patty v. State, 126 Miss. 94, 88 So. 498; Wesley v. State, 153 Miss. 357, 358, 120 So. 918; Walters v. State, 153 Miss. 709, 122 So. 189; Blackledge v. State, 157 Miss. 33, 127 So. 684; Gray v. State, 158 Miss. 266, 130 So. 150; Weathersby v. State, 165 Miss. 207, 147 So. 481; Kelly v. State (Miss.), 147 So. 487; Jarman v. State, 178 Miss. 103, 172 So. 869; Henderson v. State (Miss.), 180 So. 89; Harvey v. State, 193 Miss. 561, 10 So. (2d) 552; Newsome v. State (Miss.), 13 So. (2d) 464. And this is true even though the deceased was shot in the left side of the head and the defendant and his son had stated he was facing them when he raised his pistol to shoot at the defendant. The decease was left-handed and it was shown by the testimony of the sheriff that he was evidently facing toward the northeast and was shot from the direction of northwest. However, it is entirely reasonable that the side view from which the shot was fired can be accounted for by the fact that he came around a bale of cotton, or that being left-handed he either turned his face to shoot or to see if he could conceal himself behind the other bale of cotton. At any rate, we do not think that this circumstance alone of the deceased being shot in the left side of the head is sufficient to overturn all of the uncontradicted proof that the defendant fired the fatal shot at a time when he believed, and had good reason to believe, that his life was in immediate and impending danger at the hands of the deceased; and especially is this true in view of the fact that there had been previous difficulties between the parties shortly prior to the homicide when the deceased had tried to use a knife on the defendant, had made threats to others against his life, was regarded by the law enforcement officers of the county as being a dangerous man and was, according to the testimony of his wife, then carrying his pistol in anticipation of more

trouble with the defendant, and in view of the further fact that the defendant carried his shotgun along on that occasion only because of various threats made by the deceased against his life, and because of a warning from some of the officers that he should be on his guard.

Reversed and judgment here for the appellant.