BELL *v.* STATE.

In Banc. Nov. 14, 1949.

No. 37258   (42 So. (2d) 728)

John C. Webb, and E. C. Brewer, Jr., for appellant.

**Joe T. Patterson**, Assistant Attorney General, for appellee cited the following cases:

**Smith, J.**

Appellant, a Negro, was indicted for the murder of Mr. C. W. Broughton, a white man, and manager of a large plantation in Coahoma County, on which appellant was employed as a tenant in 1945, upon his discharge from the Army. Appellant was convicted and sentenced to be electrocuted. He appealed here.

At the conclusion of all of the testimony in the case, appellant moved for a directed verdict that he was not guilty of murder, which motion was overruled. Upon the coming in of the jury's verdict, he made a motion for a new trial, which was likewise overruled. In this Court, appellant contends that he is not guilty of murder; and that he is not guilty of any crime,—certainly no offense greater than manslaughter. He was also refused a directed verdict that he was not guilty of manslaughter. He complains that these actions of the trial court were reversible errors. We will not reach the issue of manslaughter, since, after a most careful consideration of the evidence, and of the briefs, we have concluded that appellant acted in self-defense in the regrettable slaying of deceased.

Here are the facts, practically without contradiction in the record. Appellant, at the time of the trial, was twenty-four years old, married, and the father of three children. Upon his discharge from the Army in 1945, he moved on a plantation of which the deceased, Mr. Broughton, was manager, and there embarked upon the making of a crop. On numerous occasions, without any apparently just provocation, he was cursed, threatened with whippings, and threats were made against his life,—all from the manager, which generated in him a sense of terror. At the happening of the last of such events, appellant, in pursuance of a mutual aid arrangement with his uncle, was helping to pick the latter's cotton, when the manager came by and saw him. Blowing his whistle, which was a summons to him to approach the manager,

and appellant, upon responding, was then and there again cursed, threatened with whipping or death if he did not immediately return to his own field, in spite of his explanations to deceased of what appellant called "picking in and through." Appellant testified that he knew the manager went armed habitually with a pistol. The use of this whistle, and Mr. Broughton's habit of carrying a pistol, being known to appellant, will reveal their importance later herein on further development of the facts. Appellant testified that he said nothing to the manager, but, three or four days later, being frightened, he left his ungathered crop and fled the place. From that date until the day before the tragedy, Mr. Broughton himself never saw appellant because appellant kept out of his sight, although appellant espied him many times.

On the Monday preceding the homicide on the following Thursday, in 1948, the father-in-law of appellant called at his home and requested him to let his wife return with the father-in-law, Brown, to the latter's home, and help her mother make lard and sausage. Appellant consented, and his wife and children departed with the father-in-law, and, as they were leaving, the appellant told his wife he would himself come down later that week and bring some money to get the children some "Santa for Christmas." He set no definite date, as his then employer's gin was out of repair, and he could not leave at the moment.

On the following Wednesday afternoon, he embarked upon the promised visit on the bus. Just as appellant alighted, he saw Mr. Broughton's truck coming down the road, and appellant continued down towards the river, seeking to reach the home of his father-in-law. But Mr. Broughton came on up, and headed his truck in there, stopped, and blew his whistle. Let it here be recalled that this was a familiar signal to appellant, because, as stated supra, it was the method used by Mr. Broughton to summon the Negroes with whom he desired to converse, this being a fair inference from the testimony. Two Negro men were in the truck with Mr. Broughton

at the time, and immediately one of them got out and came running down the road toward appellant, and called him to wait, saying he wanted to talk to him. Appellant, with the past heavy upon him, especially mindful, he said, of Mr. Broughton's numerous threats against his body or life, fled further toward the river. The truck attempted to head him off, so he hid on the river bank. Being unable to catch or locate appellant, his pursuers turned the truck and departed. Apprehensive that this was not an abandonment of the search for him, but a ruse to make him think so, appellant remained hidden. His fears were justified, apparently, when about an half hour later the truck reappeared and circled around, but being still unable to locate appellant, and it left the vicinity. Appellant here testified: "I was still on the river bank staying out of their way so I could get to the house and give my wife this money. I didn't want him to see me. I knew what he was going to do to me— what he said."

When he reached the home of his father-in-law, the latter was not in, but appellant's mother-in-law, his wife and their three children, were. He had hardly finished greeting them, when, on looking down the road, he saw the truck coming straight toward the house, whereupon he grabbed some shells and the shotgun of his father-in-law for the purpose of self-defense, and fled, running to the cane brakes. The truck then came after him again and hemmed him in so he could not flee along the road he intended to follow. He was cut off; there were three other men with Mr. Broughton this time; and the sun by then was low. He testified that he was not intending to harm a soul and "wasn't wanting nobody to harm me." By then, it was night and he could see the lights of the truck, so he hid in a ditch, intending to leave the gun there for his father-in-law. However, at that precise moment, the truck reappeared. Men were throwing flashlight beams around, and into cotton houses, so he stayed concealed in the ditch all night long.

Before daylight on the following morning, Thursday, he crawled out of the ditch, and went to the home of a Negress named Louella Mayes, and asked for permission to enter and warm. This was on the 23rd of December. Louella got out of bed and let him in, and he was making a fire when the last eventful scenes in this tragedy began to progress toward a climax. The home of Louella was on the plantation managed by Mr. Broughton, where she had lived for approximately two years, and he had never come there prior to this particular day. It contained three rooms. The front room, empty except for a single article of furniture; a bedroom, in which Louella slept with her children; and a kitchen, with doors leading from room to room. There was a large pile of dirt right near the house, which had been pulled up by a bulldozer, and which prevented those inside from seeing an approaching vehicle until it came close to the house. A horn blew, and appellant looked out and identified Mr. Broughton as one of the two men in the same truck, heretofore mentioned. He told Louella who it was, saying "They are going to kill me if they come in here," and also testified he plead with her to say he was not there.

By that time, the manager had reached the porch, and Louella was going to the door, whereupon appellant fled to the middle room, and he then heard Mr. Broughton say "where is that God d . . . William Bell?" After Mr. Broughton had gotten into the house, another man went around to the back, as appellant was running from the middle room to the kitchen, and was at the back kitchen door, his only exit to safety, when Mr. Broughton pushed the door open from the bedroom and broke into the kitchen. Even then, appellant was making one last desperate effort to escape being hurt or killed, or having to harm anyone, even in self-defense. The kitchen door had three fasteners on it, a bent nail, a sliding bolt, and a lock similar to a night latch. Appellant had pulled the bolt out of its socket, and was trying to undo the catch,

when Mr. Broughton closed in on him as he still attempted to flee. He then, in self-defense, shot and killed Mr. Broughton, he said.

It is to be remembered here that deceased, Mr. Broughton, as manager, had caused appellant to abandon his crop in 1945 because of his fear induced by threats of bodily harm and death; and from that time until the Wednesday before the homicide, appellant had always kept out of his sight until the manager saw him again for the first time on December 22, 1948. Immediately, Mr. Broughton began to chase appellant. This pursuit had no connection with the father-in-law of appellant and they had not even seen each other at that time. The importance of this fact will emerge hereafter in what we have to say about it. Appellant had fled, and hid, and fled and hid again, and was still attempting to flee when cornered, without hope of further escape, in the kitchen of Louella, where the deceased, armed with a pistol, had followed him. The trustworthiness of appellant's account of the events in the kitchen is convincingly attested by his failure to make any claim that deceased had drawn, or made any gesture as if to draw, the pistol, afterward found on his person, but stated that he himself shot so quickly to save his own life, Mr. Broughton could not have gotten his pistol out.

Mr. Broughton's purpose in chasing appellant on the previous afternoon, evening and night, was obviously a personal one, as there is no other possible conclusion to draw from the uncontradicted evidence in the record. Later, the father-in-law of appellant, it appears, requested Mr. Broughton to get "the law" against appellant,—just why is not exactly clear from the record. This father-in-law, Ezekiel Brown, a witness for the State, testified he saw Mr. Broughton chasing appellant on Wednesday before the Thursday of the killing. However, he asked Mr. Broughton to get "the law" as to his son-in-law. (His gun was used to do the shooting, which, of course, had not occurred at that time.) Upon

this request, Mr. Broughton pulled back his coat, revealing his pistol, stating "this here will get him", and "this is enough law right here." On the eventful, tragic Thursday morning, Ezekiel Brown again asked Mr. Broughton to get "the law" at the plantation store. It is manifest from the record that appellant had no knowledge of these requests to deceased to get "the law." Mr. Broughton then set out on his last and fatal pursuit of the fleeing appellant, which ended in his death.

On the fatal Thursday morning, Mr. Broughton called a Negro to accompany him, named Temple. On the journey to Louella's home, where the homicide occurred, this witness (the State's) testified that he saw Mr. Broughton reach under his coat, at his waistline, and remove his pistol to the right front pocket of his pants. This witness also corroborated appellant in the latter's statement that Mr. Broughton blew his horn when he arrived at Louella's house, and stated to him "if you see anyone running out of these doors, toot my horn twice while I look at the house." He, a few moments later, heard one shot, and Mr. Broughton came out of the house and fell by the truck. Subsequently, the pistol was found on his person, as above mentioned, after Mr. Broughton's death.

In her testimony for the State, Louella Mayes, at whose home the killing took place, said she did not see it, and hence there was no eyewitness to it. Louella was in bed, and was apparently excited when the shooting occurred, and while she denied hearing some of the statements appellant claims to have made to her, she said merely that she did not remember some others; and that Mr. Broughton told her he wanted to look over the house, although she said he had never found it necessary to inspect it any time previously.

Mr. Broughton was not an officer of the law; had refused to call "the law"; had exhibited his pistol and made the statement that it would get appellant; no indictable offense had been committed in his presence, and

hence he had no authority, as a private citizen, to arrest appellant; and he had been pursuing appellant Wednesday afternoon, evening and night, obviously for his own personal reasons, and at that time appellant was unarmed. The only personal purpose deceased could have had against appellant was either to do him great bodily harm, or to kill him. He had threatened previously to do so, and his statements to Ezekiel Brown indicated he still had such intent. Even on the morning of the homicide, Mr. Broughton had taken his pistol from its inconvenient place under his coat, and placed it where it was quickly available, just before reaching Louella's home, and meeting his death.

From what we have delineated above, we think it conclusive that appellant had reason to believe, and did believe, that he was in immediate danger of suffering great bodily harm or death at the hands of deceased, and that he was justified in shooting to kill. It is to be remembered that the law of Mississippi does not require flight to avoid an assailant under the circumstances of the last scene here, but that appellant was still trying to flee, and did so, after firing only one shot, which was fatal, at a time when he had other shells. He was not required, in the imminently dangerous and menacing situation in which he was placed, to await until he and deceased were upon equal terms. Furthermore, neither we, nor the jury, should test his reaction by the same calm, cool judgment that we can, in complete detachment therefrom, now bring to bear upon it.

We think our judgment here should be controlled by what we have said in the case of Scott v. State, 203 Miss. 349, at page 353, 34 So. (2d) 718, 719 as follows: ". . . At the common law, to justify the slaying of another in self-defense, there must have been actual danger of loss of life or suffering great bodily harm. Dyson v. State, 26 Miss. 362, 4 Cush. 362, 1 Morr. St. Cas. 710. But now, the danger need not be actual, but only reasonably apparent and imminent. As we held in Evans

v. State, 44 Miss. 762, the term 'apparent danger,' as applied in cases of homicide, means such overt demonstration, by conduct and acts, of a design to take life or do some great personal injury, as would make the killing reasonably apparently necessary to self-preservation or to escape great bodily harm. ██ Section 2218(f), Code 1942, makes homicide justifiable 'When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.' The phrase 'reasonable ground to apprehend,' used in the statute, implies apparent danger. Dillon v. State, (Miss.) 18 So. (2d) 457.

██ ''It was not required of appellant to prove that he acted in justifiable self-defense, but only that he raise a reasonable doubt of his guilt of the charge against him, unjustifiable homicide. The law authorizes action on reasonable appearances, Scott v. State, 56 Miss. 287; and the danger may be either real or apparent, Blalock v. State, 79 Miss. 517, 31 So. 105; Ingram v. State, 62 Miss. 142; Godwin v. State, 73 Miss. 873, 19 So. 712.''

However, in the case at bar, under its own peculiar circumstances, ██ we do not think that appellant's plea of self-defense depends upon his having seen deceased's pistol at the moment of the shooting, or any gesture toward drawing it. We have held that a defendant whose life had been threatened because of trouble over defendant's husband had the right to carry a pistol and shoot deceased in self-defense when meeting her after she got out of an automobile in which she had been riding with defendant's husband, and was not required to show that deceased had a weapon in her hand or in sight; or that deceased said anything at the time, evidencing her desire to harm defendant. Lomax v. State, 205 Miss. 635, 39 So. (2d) 267. In the case at bar, deceased is not shown to have had his pistol in his hand,

or to have said anything to appellant at the time of the shooting evidencing a desire to harm this appellant; just as in the Lomax case, supra; and he was not required to show such facts under the circumstances, such as appeared both there and here.

In Bowen v. State, 164 Miss. 225, 144 So. 230, we announced a decision that ██ ██ defendant's explanation of homicide, not contradicted directly, or by fair inference, must be accepted as true. In the case at bar, appellant's testimony is not disputed, except as to some slight incidental statements allegedly made to Louella Mayes, and is not contradicted by any fair inferences. Three days after his arrest, appellant freely made a statement to the sheriff and a deputy, identical in all essentials with his testimony from the witness stand, which was candidly repeated by those two honorable officials as witnesses for the State.

We condemned an instruction granted the State to the effect, in a plea of self-defense in a homicide case, that the danger to the defendant must have been so urgent that there was no reasonable mode of escape except to take the life of deceased. Ellerbee v. State, 79 Miss. 10, 30 So. 57; Bang v. State, 60 Miss. 571. However, in the case at bar, appellant did prove, in our judgment, that he was justified in reasonably believing he actually had no mode of escape except to take the life of Mr. Broughton. He was genuinely trying to escape when deceased rushed in on him, when he had discovered he could not undo the latch fastener to the back door, his only avenue of escape from death or bodily harm except to shoot, in our judgment, and hence was not guilty of any crime but acted in his reasonably necessary self-defense.

██ ██ We have carefully considered the excellent brief for the State, and the entire record in the case, but are unconvinced thereby that the verdict of the jury should be upheld in this case. On the contrary, in our judgment, appellant was entitled to have had the directed verdict

for which he asked; and to acquittal, on the ground of self-defense, as convincingly demonstrated in appellant's fine brief.

We therefore reverse the judgment of the lower court, and direct the discharge of appellant from custody.

Reversed and appellant discharged.