Newman *v.* State.

No. 39404 January 10, 1955 77 So. 2d 282

*Arrington & Arrington,* Hazlehurst; *Cohn, Hobbs & Hobbs,* Brookhaven; *W. M. Broome,* Crystal Springs, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson; *Henley, Jones & Woodliff, Armstrong & Hoffman,* Hazlehurst; *E. C. Barlow,* Brookhaven, for appellee.

ROBERDS, P. J.

Rupert Newman, appellant, was convicted of the murder of Cyrus Hood, and sentenced to the state penitentiary for life, the jury disagreeing as to the punishment. From that verdict and judgment, this appeal was taken.

Appellant raises many questions on the appeal, the main one of which being his contention that his request for a peremptory instruction should have been granted by the lower court. Since we have concluded, after diligent study of the record, this instruction should have been granted, we pass only upon that contention.

Appellant admits he shot and killed Mr. Hood but he says he did so in defense of his brother, Dupree Newman, at a time when Hood, without any justification, was in the act of shooting, or shooting at, Dupree, and that the action of appellant was in the lawful defense of his brother.

The homicide occurred about one o'clock in the morning of January 1, 1954, in the dining room of Bishop's Service Station and Cafe located just north of the corporate limits of the City of Hazlehurst, Mississippi.

A brief description of the premises will be of aid, we think, to an understanding of the evidence.

At this point U. S. Highway 51 runs practically north and south. Bishop's place is located near and on the west side of and faces east upon that highway. There are four gasoline pumps located between the building and the highway. These are in a row extending north and south. A few feet west of these pumps is the office used in connection with the gasoline station, the front door to which opens to the east and towards the pumps. The cafe is north of the office, but the office extends some fourteen feet east of the cafe. The cafe part is longer north and south than it is east and west. A door is located at the southeast corner of the cafe, permitting en-

trance into the cafe from the outside. The east front of the cafe is glass and there are eating booths located along the east wall. On the west side of the cafe are stools used by people while eating from a counter, which, likewise, extends north and south. The kitchen is to the west of this counter and occupies the northwest part of the building. Near the south end of the cafe is a coffee urn. The dining room is south of the kitchen. It is thirty feet long north and south and seventeen feet wide east and west. Along the west wall of the dining room are located eating booths, and a number of eating tables are located in different parts of the dining room. Between the dining room and the cafe is an opening in the form of an arch. Apparently this is several feet in width, although the exact width is not shown. This is a passageway between the dining room and the cafe. Near this opening, and on the south side thereof, is a pin-ball machine. At the south side of the cafe, but within it, is a showcase in which are kept for sale cigarettes and various knickknacks. On this showcase is located the cash register. This register seems to serve both the cafe and the gasoline station. One leaving the dining room must pass through the cafe (unless he goes through the kitchen) by going through the archway into the cafe and then out of the cafe either through the door located at the southeast corner thereof or through the passage by the pin-ball machine, register and showcase into the office and then through the east door of the office to the outside. Also, located 200 feet south of the front door to the office is a rack used in washing automobiles.

On the morning of the tragedy, Mr. Hood was in charge of the premises. There is a dispute in the testimony as to whether he was in charge of the cafe operations or whether his authority and duties were confined to the gasoline station. However, we will assume he had authority over the cafe operations.

Dupree Newman, a brother of appellant, came into the cafe around one o'clock. He took a seat at a booth lo-

cated at the northwest corner of the dining room and gave his order for his meal. It appears that Jack Kelly, Billy Smith and Barlow Porter were also seated in that booth. Porter told Smith to go out to his truck, parked in front of the building, and get therefrom a "fifth" of whiskey and bring it to the table. Smith went out, got the bottle of whiskey, but, as he was bringing it into the cafe, Hood stopped him and forbade his bringing it into the dining room. Smith replaced the whiskey in the car, and informed Porter what had happened. It is in evidence that Grady Newman, who was also present in the dining room, but not at the same table, with Dupree and his companions, said to Smith "Tell him a G. . . damn Newman sent for it." Apparently Smith reported that to Hood, who replied that it made no difference to him who sent for it.

Porter then told Roy Miller to drive Porter's truck to the rear of the building and bring the whiskey to him. Miller did that, the bottle of whiskey being in a paper sack, in which it was placed on the table occupied by Kelly, Porter and Dupree Newman. At this point Mr. Hood walked over to the booth, touched Dupree on the shoulder and told him he would have to leave the dining room and go into the cafe part of the building. There is no evidence that Hood then demanded that Dupree leave the premises. He was told to go into the cafe. And we have not discovered in the evidence any proof that there were any lady guests present in the dining room. In any event a scuffle then took place between Dupree and Hood. Dupree either hit, or hit at, Hood with his fist, whereupon Rupert Newman, the appellant, who was also present, and some others separated Dupree and Hood.

Hood then left the dining room through the archway, passed the pin-ball machine, the cash register in the cafe, and into the office of the gasoline station. As he left the dining room, he beckoned to the Newmans, or some of them, to follow him. All of the witnesses understood

that, by this action, he was demanding that the Newmans, or some of them, come outside to the front of the building. Hood was very angry. He was muttering to himself. He went out the front door of the office and turned south, which was to his right. Grady and Rupert Newman came into the office after Mr. Hood had gone out the front. There is some proof that Douglas Newman, another brother, was with them. However, Douglas disappears from the scene and we hear no more of him. Grady and Rupert opened a desk drawer in the office and looked for Mr. Hood's pistol. Rupert said he knew Mr. Hood had a pistol and usually kept it in the desk drawer or in his automobile. No pistol was in the drawer. Rupert then surmised Hood had gone to his car at the wash rack to get his pistol. There was testimony that at about this stage in the drama appellant said that if Hood came back in "bothering," or "fooling with," Dupree that he, appellant, would shoot or kill Hood. Appellant denied that he said that. He told Grady to get his, Rupert's, pistol out of Rupert's car, which was parked in front of the station near the gas pumps. However, both he and Grady went to the car. There is some difference in the testimony as to whether the pistol was in the glove compartment or about the seats of the car, and whether Rupert first got it out of the car, or Grady first got it and handed it to Rupert. These questions we consider unimportant. Grady and Rupert then reentered the front door of the office and passed through the cafe into the dining room. Rupert seated himself at a table. The proof is not definite where the table was in the dining room.

Mr. Hood procured his pistol, a 44-caliber, from his automobile parked at the wash rack, and within two or three minutes proceeded back to the front door of the office. He had his pistol in his hand. As he entered the office he placed the pistol under his coat. He paused a moment to register a sale at the cash register. He then proceeded to the dining room. Just before or just

after he registered the sale he remarked "I am going to kill all of the damn Newmans." That is not denied. As he reached the archway between the cafe and the dining room, he stopped, drew his pistol from under his coat, and, without saying a word, began to shoot at Dupree, who had remained at his booth eating his meal. Dupree was sitting at his table slightly facing the archway opening. One shot went through his left shoulder and he fell to the floor and became unconscious and therefore knew nothing that happened thereafter. It is not definitely shown how many shots were fired by Hood. While he was firing at Dupree, or immediately thereafter so as to be part of continuous acts, Rupert Newman, the appellant, shot Mr. Hood twice, either of which shots, as hereinafter shown, would have been fatal. After Mr. Hood fell, it is in evidence that either appellant or Grady Newman remarked, in vile language, that Hood would not give any more trouble. Grady Newman and appellant denied that they said that. Mr. Hood died before reaching the hospital.

Now, the first question is whether Dupree would have been justified in defending himself, even to the extent, if necessary, of killing Mr. Hood, under the foregoing circumstances.

It will be noted that Dupree had not moved from his original seat in the northwest booth. He had not obeyed Hood's command to come out of the building. He was unarmed. No one claims he was engaged in any kind of hostile demonstration towards Hood. He said not a word to Hood. The dining room was seventeen feet wide. Dupree was in the northwest corner, diagonally across the room from Hood, which placed Dupree some twenty feet from Hood. Hood, angry and threatening to kill the "damn" Newmans, suddenly appeared, drew his pistol and began shooting at Dupree. Surely, under these circumstances, Dupree would have had the right to defend himself, even to the point of taking the life of Mr. Hood. The principles announced in the following

cases justify that statement. Houston v. State, 117 Miss. 311, 78 So. 182; Patty v. State, 126 Miss. 94, 88 So. 498; Wesley v. State, 153 Miss. 709, 122 So. 189; Blackledge v. State, 157 Miss. 33, 127 So. 684; Gray v. State, 158 Miss. 266, 130 So. 150; Weathersby v. State, 165 Miss. 207; 147 So. 481; Kelly v. State (Miss.) 147 So. 487; Jarman v. State, 178 Miss. 103, 172 So. 869; Henderson v. State (Miss.), 180 So. 89; Harvey v. State, 193 Miss. 561, 10 So. 2d 552; Newsome v. State (Miss.), 13 So. 2d 464; Gandy v. State, 195 Miss. 421, 115 So. 2d 685; Bell v. State, 207 Miss. 518, 42 So. 2d 728.

But did appellant have the right, under such circumstances, to kill Hood to prevent Hood from inflicting great bodily harm or death upon Dupree? Section 2218, sub-section (f), Miss. Code 1942, provides that "The killing of a human being by the act, procurement, or omission of another shall be justifiable * * * When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." See Little v. State, 87 Miss. 512, 40 So. 165, where defendant acted in defense of his brother; and Blackledge v. State, 157 Miss. 33, 127 So. 84, where defendant killed in defense of his mother. The rule is stated in 26 Am. Jur., Section 159, page 266, in these words: "The right of one to justify a slaying on the ground that it was necessary in defense of another person stands upon the same plane or footing as, and is coextensive with, so far as justification is concerned, the right of the person to whose aid he goes, under the existing circumstances of the particular case; or, as is sometimes stated, the right to justify killing in defense of another depends upon the same conditions as would be necessary to excuse such other person under the plea of self-defense." In other words appellant had the same right to defend his brother as his brother had to defend himself. Nor is it intimated

that appellant was making any demonstration towards Hood whatever. In fact, it is not shown that Hood knew appellant was in the dining room at the time Hood shot Dupree.

But it is ably argued by the State that the testimony of Loy King, Jr. made an issue for the jury as to whether Hood was shooting at Dupree and whether Rupert shot Hood during the time, or immediately after, Hood was shooting at Dupree. Five eye-witnesses testified. King was one. He was placed on the stand by the State. The other four testified for the defendant, and the testimony of the four established the essential facts at the time of the shooting as we have related them above. King said he was standing at the pin-ball machine. He gave his version of the trouble preliminary to Hood's departure for, and his return with, his pistol, and then he said ''Mr. Hood later came back in and when he passed me he reached in his coat — he had on a big brown coat — and he reached in his coat and pulled out the gun and just as he threw it up to fire — I don't know, I can't get it clear in my mind whether Rupert grabbed his arm just time he fired or a second after he fired. I don't know exactly which.'' He was then asked: ''Then what occurred?'' He answered ''Rupert shot him and he fell.'' He said there were five or six shots in all. All of the eye-witnesses said that. Again King said: ''I say when he went in and pulled out his gun I don't know whether Rupert had grabbed his arm before, or a split second after he shot, or just time he shot.'' Q. ''And after Mr. Hood shot, then Rupert shot, didn't he? That is what you testified before.'' A. ''Yes, sir.'' Q. ''That is right. Rupert didn't shoot and kill Mr. Hood until after Mr. Hood had shot at Dupree, is that right?'' A. ''The first gun or second gun, I don't know which it was.'' Q. ''And after he shot that pistol at Dupree then Rupert shot him?'' A. ''He was holding his arm when he shot him. Rupert was holding Mr. Hood's arm when he shot him.'' Q. ''Rupert was hold-

ing whose arm?" A. "Mr. Hood's." Q. "He grabbed Hood by the arm?" A. "And shot him." Q. "That was after Hood shot Dupree?" A. "After or just before, I don't know which." He also admitted that at a habeas corpus hearing he had shown that Hood fired first. He was asked if that was true and he said "Yes, sir." He also admitted that he said at that hearing "I am pretty sure he shot Dupree." He was asked if he adhered to that and he said "Yes, sir." In answer to the question whether he saw the shot hit Dupree he admitted he testified at the habeas corpus hearing, and he reiterated on the stand, "I couldn't say whether I saw him hit or not, but I think it knocked him back in the booth, or in the floor. I am not sure." He admitted that at the former hearing he had testified that Mr. Hood shot Dupree "down" but at this trial he said "Well, I have thought it over and I don't know what bullet hit him." He was asked if Hood's gun was pointed in the direction where Dupree was sitting and replied "I guess it was." Finally he testified that when Hood got to the dining room he pulled his pistol from beneath his coat and "pointed it and shot." He said when Hood passed him "he was looking pretty angry," and as he approached the dining room he pulled a pistol from beneath his coat and pointed it. He was asked "And it exploded?" and answered "Yes, sir, I imagine it did." He was also asked "And then Rupert shot him from the right side?" and answered "Yes, sir." We have set out this testimony at length because of the stress laid upon it. We do not think it tends to disprove the testimony given by the other eye-witnesses to the effect that Hood shot, and shot at, Dupree, and that Rupert shot Hood at the moment of Hood's shooting, all as a part of the same continuing acts.

And on the question of whether Hood was shooting, or shooting at Dupree, (the effect being the same) it should be kept in mind that Dupree was shot; that only Hood and Rupert displayed pistols, and that certainly

Rupert did not shoot his own brother, whom, all the testimony shows, he was endeavoring to protect.

The State further urges that the manner in which Hood was shot presents an issue for the jury as to whether the shooting of Hood by Newman was in defense of Dupree Newman. Hood was shot twice. Both shots entered the back of his neck. One entered about one-and-a-quarter inches to the right of the middle of the neck, about the hairline, and ranged upwards, emerging at the right ear; the other entered about three inches to the left of center, at the hairline, ranged to the right and emerged at the right shoulder. Now, the defense here is the defense of Dupree — not of the defendant himself. Had the plea been self-defense, the fact that the shots entered the back of Hood would have been very pertinent on the question of self-defense of appellant himself. However, under the plea here, appellant had the right to shoot Hood any place, or from any position, to prevent his shooting Dupree. There is really no dispute that Hood shot Dupree before appellant shot Hood. Dr. Blaine, witness for the State, testified that either of the shots would have been fatal to Mr. Hood, and that Mr. Hood could not have shot Dupree after receiving either wound, except that "he could have had a reflex firing," by which he means, we presume, Hood could not have consciously pointed his pistol at Dupree after receiving his wound. All of the witnesses said five or six shots were fired. Hood fired at least two of them. The witnesses also said they were rapid-fire shots. Smith, a witness for the State, said they were "pretty fast." Mohon, a witness for the State, said he heard five shots "pretty fast for a pistol." King, eye-witness for the State, called them "burst" shots. Witnesses for the defendant, who testified about the rapidity of the shots, all said they were in rapid order. In other words, there is no dispute here that appellant shot Mr. Hood while Mr. Hood was shooting at Dupree. Just why Hood was shot in the back of the neck is not explained. King,

a witness for the State, said appellant grabbed one of Hood's arms "just time he fired or a second after he fired. I don't know exactly which." He was asked "Then what occurred?" and answered "Rupert shot him and he fell." King said that Rupert was on the right side of Hood. Appellant also said that. His account is this: He came back into the dining room. Shortly Mr. Hood came back in. He was asked: "When did you next see Mr. Hood?" A. "Next thing I seen he had leveled down and shot Dupree." Q. "Where was he?" A. "He was standing just inside the dining room." Q. "What was he doing with the pistol?" A. "He fired and shot my brother Dupree." Q. "Did you see him do that?" A. "Yes, sir." Q. "What did you do then?" A. "I pulled my pistol out of my pocket and shot him." Q. "Which side of him were you standing on?" A. "I was standing on his righthand side." He thought Hood "wheeled." The position of the wounds upon Mr. Hood do not, in any manner, disprove the contention that appellant shot him to protect the life of appellant's brother. It is clearly evident that Hood shot Dupree before he, Hood, was shot, and just as evident that appellant shot Hood during, or right at the time, Hood was shooting and shooting at Dupree. In thinking on this question, it should be kept in mind that Hood did not kill Dupree, he only wounded him, and that appellant had the right to prevent his life being taken after he had been wounded.

The State says Dupree was engaged in the commission of a misdemeanor and that this in some manner justified the actions of Hood. In the first place, it is not clear what misdemeanor, if any, was being committed by Dupree. If it be based upon the possession of the whiskey, it should be noted that the whiskey belonged to Porter. He had it in his truck. Porter sent for it and had it brought in and placed upon the table. Dupree did not own, or have possession of, the whiskey. He did not have

it brought in and was not in control of it. All ownership, control and possession of the whiskey was exercised by Porter.

But even though Dupree had possessed and controlled the whiskey, this gave Hood no right to shoot him. "Generally, the prevention of a mere misdemeanor furnishes no excuse for a homicide." 26 Am. Jur., Section 124, page 240. If Hood was in charge of the dining room, and Porter insisted, over his objection, on keeping the whiskey on the table, Hood should have called an officer rather than go out and arm himself and return and shoot Newman. There was no emergency about that situation.

The State also urges that Dupree was a trespasser and that this justified the conduct of Hood. "A mere trespass or entry upon one's premises other than his dwelling, not amounting to a felony, is not considered sufficient provocation to warrant the owner's using a deadly weapon in its defense, or sufficient provocation to arouse the degree of passion requisite to reduce from murder to manslaughter his crime in slaying the intruder, notwithstanding the killing may have been necessary to prevent the trespass." 26 Am. Jur., Section 27, page 173. Again "While the law justifies or excuses the taking of life when necessary to prevent commission of felonies, or in the defense or protection of one's dwelling house or habitation, one cannot defend his property, other than his habitation, to the extent of killing the aggressor for the mere purpose of preventing a trespass, where the invasion is made without force * * * Generally speaking, a mere trespass is not such provocation as to entitle one to use a deadly weapon or to reduce a killing from murder to manslaughter, unless the trespass is accompanied by the destruction of or injury to lands or goods; and if one deliberately kills another to prevent a mere trespass on property, whether such trespass can or cannot otherwise be prevented, it is murder." 26 Am. Jur., Section 172, page 272. McDaniel v.

State, 16 Miss. 401; Hairston v. State, 54 Miss. 689; Mc-Master v. State, 29 So. 522; Wise v. State, 182 Miss. 791, 183 So. 521.

We might add, in this connection, Dupree was not a trespasser. He was in a public cafe. The public was invited to that place. It held out an invitation to the public. He had ordered and was eating a meal. He had not been requested to leave the premises. Hood told him to leave the dining room and go into the cafe, a part of the same building.

And a complete answer to the contention is that Hood was not trying to eject Dupree from the premises. When Hood appeared at the threshold of the dining room, he began to shoot Dupree. He never requested him to leave the room. In other words, Hood was not endeavoring to prevent a trespass if a trespass was being committed. He simply appeared and shot the man without making any demand or saying a word.

The State, through its able counsel, contends that the proof established some kind of a conspiracy on the part of the Newmans. It is not clear, from the record, just what crime it is contended they conspired to commit. At one place in the record, it is stated they conspired to override Hood's objection to the whiskey being placed upon the table. The object of the conspiracy contention was to render admissible as against appellant all statements made by any of the Newmans. That was the reason, no doubt, the learned trial judge admitted the statements. We deem it unnecessary to follow up and decide the conspiracy question except to say: The conspiracy justifying admission of statements by persons other than the defendant would have been a conspiracy to commit the crime with which defendant was charged — in this case the murder of Mr. Hood. Jones v. State, 189 Miss. 533, 198 So. 555. The proof is entirely insufficient to establish any such conspiracy. In this connection, it may be pertinent to observe that had the Newmans intended to kill Mr. Hood, the opportune time would have been

while they were outside the building and when, or after, Grady and Rupert Newman had procured Rupert's pistol from his automobile and Mr. Hood had procured his pistol from his car, at which time, apparently, there would have been no eye-witness other than Grady and Rupert Newman.

 We, of course, are deciding the case upon the record before us. Neither the reputation for veracity nor for peace and violence of any of the actors or witnesses is in issue on this record. That record discloses, without material contradiction, as we view it, that Mr. Hood, in an angry mood, procured his pistol, and after threatening to kill the Newmans, appeared at the threshold of the dining room, drew his pistol and shot Dupree Newman, when Newman was unarmed, was making no hostile demonstration whatever towards Mr. Hood, and Hood was in no real or apparent danger at the hands of Dupree Newman, and that Rupert Newman, the appellant, shot Mr. Hood while he was shooting, or shooting at, Dupree Newman, and in the necessary defense of his brother Dupree. Therefore, the peremptory instruction requested by defendant should have been granted.

Reversed and appellant discharged.

*Hall, Kyle, Holmes* and *Gillespie, JJ.,* concur.