# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-01602-COA

**JIMMY DALE REID A/K/A JIMMY DALE REID, JR. A/K/A JIMMY REID A/K/A JIMBO REID**　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　**APPELLEE**

DATE OF JUDGMENT:　　　　　　　10/24/2018
TRIAL JUDGE:　　　　　　　　　　HON. ISADORE W. PATRICK JR.
COURT FROM WHICH APPEALED:　WARREN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:　　　OFFICE OF STATE PUBLIC DEFENDER
　　　　　　　　　　　　　　　　BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:　　　　OFFICE OF THE ATTORNEY GENERAL
　　　　　　　　　　　　　　　　BY: JOHN R. HENRY JR.
DISTRICT ATTORNEY:　　　　　　RICHARD EARL SMITH JR.
NATURE OF THE CASE:　　　　　　CRIMINAL - FELONY
DISPOSITION:　　　　　　　　　　AFFIRMED - 12/17/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND TINDELL, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.　Richard May Jr. was shot and killed at a motel in Vicksburg, Mississippi. After a three-day trial, a Warren County Circuit Court jury convicted Jimmy Dale Reid of manslaughter for May's death, and the jury also convicted Reid of being a felon in possession of a firearm. Reid was sentenced to twenty years of incarceration for the manslaughter conviction and to serve a consecutive term of ten years for the firearm conviction. He is presently incarcerated with the Mississippi Department of Corrections (MDOC).

¶2.　Reid appeals, asserting that the trial court erred by refusing his castle doctrine jury

instruction, by mischaracterizing testimony as "hearsay" and issuing a limiting instruction with respect to that testimony, and by failing to exclude other-bad-act evidence under Rule 404(b) of the Mississippi Rules of Evidence. Reid also asserts that there was insufficient evidence to support the jury's manslaughter verdict against him and that the manslaughter verdict was contrary to the overwhelming weight of the evidence. For the reasons discussed below, we affirm Reid's convictions and sentences.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. May was shot and killed at the Battlefield Inn motel in Vicksburg shortly after 9:00 p.m. on September 11, 2015. After the police responded to the "shots-fired" call and had been at the scene for several hours, they found Reid under a storage building behind the motel around 1:15 a.m. Reid was bleeding from three gunshot wounds. Reid was subsequently indicted in May 2016 for May's murder pursuant to Mississippi Code Annotated section 97-3-19 (Rev. 2014) (Count I) and for felon-in-possession-of-a-weapon pursuant to Mississippi Code Annotated section 97-37-5 (Rev. 2014) (Count II).

¶4. The case was tried before a Warren County Circuit Court jury on September 24-26, 2018. The State presented thirteen witnesses. The defense presented one witness, and Reid also testified on his own behalf. For clarity, we will set forth the facts primarily in the order in which the events occurred, which does not necessarily follow the order in which the witnesses were presented at trial.

### I.    Background

¶5. The testimony and evidence at trial showed that Reid has a 2014 conviction in Warren

2

County for felony fleeing-or-eluding-a-law-enforcement-officer. His sentence included suspended time and supervised release. Between July 2015 and September 7, 2015, Reid was incarcerated on a technical parole violation for a period of forty-five days. While Reid was incarcerated in an MDOC technical-violation facility, his girlfriend, Christina Cotter, who testified that she made her living selling drugs, exchanged $250 worth of methamphetamine for a stolen assault rifle. According to Cotter's testimony, that rifle, along with other firearms, had been recently stolen from May by a person named Chase Sherman. Cotter testified that Reid was not involved in her drug business or the assault-rifle transaction.

¶6. Before Reid's release, Cotter testified that there were communications between her and May about Cotter returning May's rifle to him in exchange for May reimbursing Cotter the cash equivalent of what she traded for the stolen rifle. She testified, however, that when they met for the exchange, May did not pay her. Instead, according to Cotter, May, and others that were with him, beat up Sherman and then left. Cotter testified that she did not return the rifle to May but later gave it to someone in Louisiana because, as a convicted felon, she was not supposed to have a weapon. She testified that she does not know where the gun is.

¶7. During this same time, the record reflects that May posted accusations and threats on Facebook and another Internet site, demanding that the persons involved in taking his weapons return them. He specifically mentioned Reid in his posted accusations and threats. Both Cotter and Reid testified that Cotter made Reid aware of May's postings while Reid was still incarcerated.

3

¶8.    Reid testified that, while at the technical violation facility, he had Cotter call May on a three-way connection, and Reid tried to explain to May, without success, that he was not involved. According to Reid, May continued to insist that Reid should see that Cotter return the stolen firearms, and May said, "I ain't going to let nobody take anything from me. I don't know who you all, who the f— you all think I am."

¶9.    Reid testified that when he was released from the technical-violation facility on September 7, 2015, Cotter showed him May's Facebook and other postings. Reid described another phone conversation between May and Reid on the day Reid was released from custody. Reid testified that although May did not specifically threaten to kill him, he did threaten him, telling Reid that "[y]ou better have my s— back as soon as I see you. When I see you, you better have my s—. I want it right then."

¶10.    On September 10, Cotter and Reid went to the Battlefield Inn in Vicksburg where Cotter was sharing room number 135 with two other women. Reid testified that the next day, he rented another room, number 162, as evidenced by the room receipt, which was marked exhibit D-8 and admitted into evidence at trial. According to Reid, he rented room 162 so that he and Cotter could have more privacy. Reid also testified that when he was in the motel office, he saw an acquaintance, Tamarus Dillon (sometimes referred to as "B" or "Binky"), who asked Reid if he already had a room. When Reid told him that he did, Dillon asked if he could "put his stuff in Reid's room" until he (Dillon) figured out what he wanted to do. Reid testified that he told Dillon that he could do that but that he (Reid) "just wanted the room back for [the night]." According to the testimony of Dillon and his girlfriend, Anna

4

Brown, however, Reid had called Dillon earlier that day to tell them to come over to the Battlefield Inn because he had a room for them. Reid, Cotter, Dillon, and Brown went to room 162. Later, the record reflects that a friend of Dillon's, Josh Rush, went to room 162. Numerous witnesses testified about the ensuing events as follows.

## II. The State's Case-in-Chief

### A. Peyton Lipe

¶11. The State's witness, Peyton Lipe, testified that he, his wife, and Josh Rush went to the Battlefield Inn during the evening of September 11. Lipe testified that he had talked to Dillon earlier that day. Dillon had called wanting something to eat, so they were taking food to Dillon in exchange for drugs. As they were pulling into the Battlefield Inn, Lipe testified that they saw May in his pick-up truck. Lipe testified that they were in a Chevrolet Z-71, and May was in "some sort of pick-up." May flashed his truck lights a couple of times, Lipe stopped in the front of the motel, and they had a short conversation about some money Lipe owed May. Because a car had pulled up behind them and needed to get through, they drove to the back parking lot.

¶12. Lipe testified that Joseph Acuff was May's passenger, although he did not know Acuff at the time. According to Lipe, after they parked, Rush exited Lipe's vehicle and went around the corner to room 162 where Dillon was. Acuff exited May's truck and went in the same direction. May came over to Lipe's truck and stood at the passenger door and they talked. May asked Lipe if he had seen Reid or knew where he was. Acuff then returned and also asked Lipe if he had seen Reid or knew where he was. Lipe testified that Acuff then

went back around the corner of the building to room 162, and a few minutes later Cotter walked past them from the direction that Acuff had gone.

¶13. Lipe testified that "no sooner than it seemed like [Cotter] got out of sight, [he] heard one gun shot." Lipe testified that May then ran in the same direction as Acuff had gone, toward room 162. Lipe further testified that immediately after May got out of his sight, Lipe heard multiple gunshots and saw May fall at the corner of the building. Lipe then saw two men run past his truck, one chasing the other, and heard more gunfire. Lipe recognized Reid as the one being chased.

¶14. Lipe testified that his truck was struck by two bullets, and the record reflects that one projectile was recovered from Lipe's vehicle. Lipe testified that he did not see who was shooting, nor did he see any weapons, he only heard shooting. He further testified that he and his wife left immediately.

¶15. The record reflects that Lipe gave a statement to police the following day (September 12), and at that time he told police that May walked away toward the motel rooms before Cotter came walking by and was not by Lipe's truck when the shooting started. Lipe testified at trial, however, that this was not correct—May was still at Lipe's truck when Cotter walked by and when the first shot was heard. Lipe said he could see things "more clearly today" and that he was at a better point in his life, having been in a faith-based rehabilitation program for three months by the time he testified at trial.

### B. Eric Collins (the Battlefield Inn Desk Clerk)

¶16. The motel clerk on the evening of the shooting, Eric Collins, also testified for the

6

State. He testified that, before the shooting, he saw two pick-up trucks pull up in front of the motel. After sitting in front of the motel for a short while, the trucks pulled around to the back side of the motel. Collins testified that the people in the trucks appeared to be having a conversation, and he did not see anyone get out of either truck.

¶17. The desk clerk further testified that shortly before 9:00 p.m., a man came to the back door of the office, which is kept locked, and tried to enter. As he was going to unlock the door, that man and another man entered the office. Collins testified the first man had a black pistol in his right hand. The second man, who the clerk said was unarmed but was chasing the first, came in and told the him,"[c]all the police this guy just killed someone." Collins testified that the other man (the one being chased) "[n]ever said anything." He testified that the men ran through the back of the building down a hallway, but they could not exit; so they ran back through the front. The clerk testified that, at some point, the men ran behind the front desk of the building into a small room and were scuffling. The clerk ran down the hallway, locked himself in a motel room, and called 911. The two men continued running throughout the building, and the desk clerk heard the chaser say, "[H]ey, you fin [sic] to die too, boy, they coming for you." Collins testified that he heard police sirens right after he heard that statement. He identified Reid at trial as the man that he saw running with the gun. Collins testified that he did not hear any gun shots.

### C.     Tamarus Dillon ("B" or "Binky")

¶18. The State's witness Dillon, also known as "B" or "Binky" as noted above, testified that he and his girlfriend, Anna Brown, went to the Battlefield Inn on September 11 between

7

6:00 and 7:00 p.m. He testified that they went there because Reid had called him saying he had a room for him. When Dillon and Brown got to the Battlefield Inn, Reid let them use room 162 that Reid had rented. Dillon and Brown first went to room 135 to meet Reid and get the key, and then Dillon, Brown, and Reid went to room 162, and Cotter joined them. Dillon's friend Josh Rush, who had come with Lipe, arrived later.

¶19.   Dillon testified that he had drugs and all the drugs that were in the room belonged to him. He also testified that he brought a .45-caliber handgun with him, but he did not bring any other guns. He testified that he saw other weapons in the room and that Reid had a .40-caliber handgun that he showed to Dillon before the shooting. Dillon testified that just before the shooting, he was in the bathroom-area of the room "messing with the drugs" when Reid said something to him about somebody being outside "messing with his girl." At trial the judge asked Dillon to clarify this statement. Dillon testified that what he believed Reid meant was that he (Reid) thought someone was outside having an altercation with his (Reid's) girlfriend.

¶20.   Dillon testified that shortly after Reid made the remark to him, he heard "gun shot" or a "gun cock." Right after that he heard more gun shots—"a lot of shots." Dillon testified that when the shooting stopped, it was just him, Brown, and Rush in the room. He and Brown gathered up their belongings and left the room with Rush. Dillon testified that as they left, he cautiously peeked out of the room's door and saw May's body on the ground. Dillon testified that he did not see who was outside the door, he did not hear a knock, and did not hear the door open. He testified that Brown and Rush ran off. Dillon testified that he was

8

standing outside of the room, and Joseph Acuff was also there and asked him for a gun. Dillon testified that he told him "no." Dillon testified that the police arrived, Acuff told them that May had been shot, and Dillon left.

¶21. Dillon also testified that the next day, he went to get the Jeep that he had purchased from May. May and Acuff were supposed to put a motor in it that day. Dillon testified that Acuff pulled up in a black SUV and said, "[A]in't nobody leaving in this truck," referring to the Jeep. The two men argued. According to Dillon, Acuff threatened Dillon with a knife. Dillon fatally shot Acuff. The matter was presented to a grand jury, but it was not tried.

¶22. Dillon was also questioned about his contact with May throughout the day and evening of September 11. He testified that he had been communicating with May, and phone records were admitted into evidence through another witness as exhibit D-11 that reflected numerous calls between May's and Dillon's phones. Dillon testified that the phone calls were about a Jeep he was buying from May. Dillon testified that he did not know of any plan that May was going to confront Reid. He testified that on September 11 he told May to come to the Battlefield Inn to pick him up and for them to go work on the Jeep. Dillon said he did not tell May he was in room 162. Dillon also testified that he was aware of "some problem" between Reid and May, but he did not think it was serious. He testified that he had been told about May's accusations concerning the stolen firearms, but he did not know anything first-hand or any details. He testified that he did not know that May had threatened Reid. Dillon denied helping May by setting Reid up on the night of the shooting.

### D. Anna Brown (Dillon's Girlfriend)

¶23.   Anna Brown, Dillon's girlfriend, also testified for the State.[1]  She testified that she went to the Battlefield Inn with Dillon on September 11, and, like Dillon, she also testified that they went there because Reid had called Dillon to tell him he had a room for him.  She testified that during the evening, she, Cotter, Dillon, Reid, and Rush were in room 162.  Cotter left before the shooting.  Brown testified that she was sitting on the bed with a laptop.  After Cotter left, Reid was on the phone.  Brown testified that this might have been Cotter calling Reid.  After this phone call, Brown testified that Reid said to Dillon, "[Y]ou better get your boy, . . . or I'm going to end this s— tonight."

¶24.   According to Brown, drugs and guns were present in the room.  She said everyone had a gun.  Brown testified that Rush brought several guns to the room, and they were on a table that was near the door.  She testified that Reid had a handgun.  After further questioning, she testified that she could "kind of notice" it under his clothing and that she saw it when he pulled it out from under his clothing "[w]henever the hotel door opened, and the shooting occurred."

¶25.   Brown also testified that he was aware that May had sold a Jeep to Dillon.  She said May was supposed to take Dillon somewhere and that he kept calling Dillon's cell phone.  She answered one call and talked to May on Dillon's phone just before the shooting.  She testified that May asked her where Dillon was, and she told May that Dillon had stepped out for a minute; May said to tell Dillon he (May) was there.  She told May she would tell Dillon to call him when he got back.  When questioned about the shooting, Brown testified that it

---

[1] Brown testified that she had a drug problem during the relevant time period.

10

happened very fast, and that she did not hear anyone knock. She testified that Reid opened the door, and she saw Acuff from where she was sitting. She also testified that she was positive that May was also there because she saw him on the ground and not moving when she left the room. According to Brown, when Reid opened the door, Acuff said to Reid, "[D]o you think we give a f— about that pussy-a—" and then Reid "shot his bullet." She testified that Reid was inside the room when he shot. Brown testified that she and Rush then ran into bathroom, and Dillon was also in the bathroom. Brown further testified that when Reid opened the door, she was not sure whether he had his handgun pulled already or not. She did not know if May and Acuff had any weapons, and she did not see any.

¶26. Defense counsel brought out in cross-examination that in Brown's statement to the police, she said that she did not know who fired first, implying that someone else was firing a gun. She also told police that she could not see who was at the door. Additionally, Brown told police there were no firearms in the room or drug activity. Brown testified that at the time she gave her statement to the police she was on suicide watch and medication.

¶27. Brown testified that after the shooting, she gathered her belongings and left the room with Dillon and Rush. She saw May on the ground as they left the motel room. Brown testified that she ran "into the woods" and stayed there about four hours—she threw her belongings "in the bushes" but held onto her purse and cell phone. She did not know where Dillon went. She testified that Rush went into the woods separately. Brown testified that the small handgun found with her belongings that the police later found "could have" been put in her bag by her or someone else. Before entering the woods, Brown heard Acuff ask Dillon

11

for a weapon. She said Dillon had a handgun but that he did not give it to Acuff.

### E. The Crime Scene and the Results of May's Autopsy and the Gun Residue Tests

¶28. A number of law enforcement officers and investigators testified at trial about the crime scene and the ensuing investigation. The Warren County Coroner, Doug Husky, and the State's forensic pathologist, Dr. Brent Davis, also testified at trial, as well as David Whitehead, the State's expert in gunshot-residue examination.

¶29. The trial record reflects that police responded to a 911 "shots fired" call and found May on the sidewalk at the Battlefield Inn, near room 164, deceased. Dr. Davis testified that May died from four gunshot wounds and that no projectiles were recovered by the autopsy. Officer Eric Proctor, who was the first officer to arrive on the scene, as well as the investigators on the case, testified that near May's body there was a loaded .22-caliber semi-automatic pistol, a cell phone, keys, some spent .40-caliber shell casings, and projectile fragments. The keys found near May fit a Ford pick-up truck in the parking lot.

¶30. Near the motel's office entrance, police found a .40-caliber handgun magazine. There was conflicting testimony that the magazine was empty and also that it had nine live rounds in it. No .40-caliber weapon was found, only the magazine. According to Investigator Jeff Merit, the magazine was not dusted for fingerprints, nor was it submitted for analysis. Numerous .40-caliber spent shell casings were outside on the motel grounds in various places. A total of eight .40-caliber casings were found. Two live rifle rounds of unstated caliber were found in the parking lot. Police also recovered two spent .22-caliber casings near May's body.

12

¶31. Investigator Diawardrick Grover testified that inside room 162 the police found a spent .40-caliber casing by a lamp and tv stand. They also found two live .45-caliber rounds on the nightstand. Investigator Grover also testified that two spent projectiles were extracted from Peyton Lipe's truck the next day. No ballistics opinions were offered at Reid's trial.

¶32. David Whitehead, a forensic scientist with the Mississippi Forensic Laboratory, was admitted as an expert in the field of gunshot residue examination. He testified that Reid, Rush, Acuff, and May all had gunshot residue or indicative residue on their hands. He further testified that these tests did not necessarily mean that these individuals had fired weapons, only that they had been in an environment where firearms had been fired.

¶33. According to the testimony of Investigator Grover, the belongings that Anna Brown discarded were found in a grassy area off of the Battlefield Inn parking lot and included clothing, a laptop, two live rounds of unspecified caliber, an HPC cell phone, and an empty.40-caliber Smith and Wesson handgun. Photographs of blood on the door to the small room behind the motel office desk were admitted into evidence, and there was also blood on the floor of this room.

¶34. Investigator Troy Kimble testified that Reid was found "hiding" underneath a storage structure on the property about four hours after the shooting occurred, and this testimony was corroborated by Investigator Merit's testimony. Reid had been shot, but Investigator Kimble testified that Reid was conscious and talking when he was found. Investigator Merit testified that after being found under the storage building behind the motel, Reid was detained and taken to a hospital. His three gunshot wounds were treated, and he was released back to

custody the same morning. Reid was interviewed on September 14. He told investigators he acted in self-defense and showed them May's Internet postings.

¶35. The record also reflects that the police recovered three cell phones—the phone used by Reid, the phone found near May, and Anna Brown's phone. However, according to the testimony of Investigators Merit and Kimble, the phone used by Reid and the one found next to May are missing, and no one knows where they are. Additionally, phone records were subpoenaed, but police did not get a complete list of the activity for the time periods requested. The records that were recovered from May's phone do show several calls between his phone and Dillon's phone on September 11 just before the shooting incident. There were also calls from Dillon's phone to May's phone after the shooting that were unanswered. There were multiple calls between them before September 11.

### F.    Christina Cotter (Reid's Girlfriend)

¶36. The State's final fact witness was Reid's girlfriend, Christina Cotter, who testified that she was not present for the shooting incident. She left moments after Josh Rush arrived at room 162, which was about ten minutes before the shooting. Cotter testified that before she left, Reid saw a call coming in from May to Dillon's phone. She testified that Reid commented that Dillon "needs to get his boy."

¶37. Cotter left room 162 and headed back to room 135; on the way, she saw May. May asked her where Reid was, and she responded that Reid was "not studying that s—" and went on her way. The trial judge asked Cotter to repeat her testimony on that point. Cotter testified that she told May that "Jim Bo wasn't studying that s—. He wasn't worried about

14

it. You know, because they had been beefing previously on Facebook." She testified that May gave no response.

¶38. Cotter testified that she then went back to room 135 and called Reid and told him May was outside on the motel property. When asked why she felt it was necessary to call Reid, she testified that she felt like Reid needed to know. She testified that her call to Reid "couldn't have been no more than [ten] minutes" before the shooting. According to Cotter, she thought that Reid telling Dillon that he needed to "get his boy" was Reid's attempt to avoid a confrontation.

¶39. Cotter testified that she did not see any weapons in room 162. However, she testified that she did see Reid with a small pistol earlier. Cotter testified that she did not see Acuff until after the shooting when he ran by room 135.

### G. Reid's Sentencing Order on a Prior Conviction Admitted into Evidence

¶40. Through the testimony of Jane Daigre, the Warren County Circuit Clerk, the State had the October 21, 2014 sentencing order on Reid's fleeing-or-eluding-a-law-enforcement-officer conviction admitted into evidence.

### III. The Defense's Case-in-Chief

¶41. After the State rested, the defense moved for a directed verdict, which the trial court denied. The defense then presented one witness, Brandon Pickering, and Reid also testified on his own behalf.

### A. Brandon Pickering

¶42. Defense witness Brandon Pickering testified that two to three weeks before the

15

shooting, he had a conversation with May as they were standing in Pickering's front yard. At the time, May lived about a one-half of a mile from Pickering. Pickering testified that Acuff was also there with May, along with another man named Rachard Neal. Pickering said they were just talking about trucks and motorcycles, but during the conversation, May stated that when he [May] sees "my boy[,] [Reid,] he was going to kill him." Pickering testified that did not know why May said this and was not aware of anything being "stirred up" between Reid and May. Pickering told May to "just leave it alone." Pickering testified that they talked a few minutes longer, and then May, Acuff, and Neal left. About a day or two after Reid got out of jail, Pickering told Reid exactly what May had said, "that when he sees him, he was going to kill him."

## B. Defendant Jimmy Reid

¶43. Reid then testified on his own behalf. He testified that during the late afternoon of September 11, he went back to room 135 at the Battlefield Inn and took a nap. Dillon, who had been out of room 162, phoned and said he was returning. Between 8:30 and 8:50 p.m., Reid and Cotter went back to room 162. Right after they got there, Dillon and his girlfriend, Anna Brown, arrived around 8:55 to 9:00 p.m. Moments later, Josh Rush came in and was introduced to Reid by Dillon. Cotter received a text message and left.

¶44. Reid testified that Rush and Dillon were in the back by the bathroom, Brown was on the bed with a laptop. He testified that Dillon was receiving calls and texts constantly. The door to the room was open, so Reid went to shut it. As he was about to shut the door, Reid testified that Cotter came back to the door and told Reid that May and Acuff were outside

16

and had asked her about his whereabouts. Reid said he was "shocked and didn't know what to do." Cotter left. Reid shut the door. Reid testified that he remembered that May and Acuff had beat up Chase Sherman, the man who had allegedly stolen May's guns, and knew he was in trouble. Reid said May and Acuff had tough reputations, and if a person has a problem with them, "sooner or later [they] are going to have an issue." Reid testified that he did not want to confront them, but he knew that they were looking for him.

¶45. Reid testified that he decided to leave. He further testified that he was suspicious of Dillon too. Reid turned to leave the room, and there was a knock on the door. He opened the door and saw May and Acuff and another man standing outside the door with handguns. Reid testified that he told them, "I heard [y'all] been looking for me," and one of the men made some remark. According to Reid, he then seized one of the handguns, of unknown caliber, from the motel-room table. He could see Acuff in the doorway, and Reid said he tried to run out but was immediately shot in the arm and returned fire in the direction of the muzzle blasts that were directed toward him. He continued to try to escape but was shot again in the arm. He was able to run, but he was being chased by Acuff all the way to the motel office. Reid testified that Acuff was hollering "you going to die" and shooting at Reid. By then, Reid had run out of ammunition. Reid said he threw the gun down, and when he arrived at the motel office, he did not have a weapon. He testified that he had already given Cotter's cell phone he was using back to her.

¶46. Reid testified that he went in the motel office and told the desk clerk to call 911 and that he had been shot. Reid said he went behind the front desk and into a small room, shut

the door, and hid in a corner with the lights off. He testified that it was his blood on the door to that room as shown in exhibits D-5 and D-6. Reid testified that he could still hear Acuff hollering "you going to die too, you going to die." Reid stayed in the dark room for a few minutes then realized that there was an exit door, so he went out to a building behind the motel and climbed under it to hide. He passed out and remained there until police found him.

¶47. Reid testified that he learned at the hospital later that he was actually shot three times. None of the projectiles went all the way through his body, and none were removed. Police did not photograph his injuries.

¶48. Reid recalled Pickering coming to his home and telling him that May said he was going to kill him. Reid said he was not concerned because he thought Cotter had resolved, or was going to resolve, the problem; which is why he did not pre-arm himself. All Reid said he wanted to do was avoid May. Reid denied carrying a firearm before the shooting. He said the guns in room 162 belonged to Dillon and Rush. Reid testified that he first saw the guns laid out on the table when he returned to room 162 after his nap. Reid said the .22-caliber handgun that was found by May's body was the gun that was fired at him. The shooting happened at the room Reid had rented; he did not invite May and never heard Dillon invite May to the room either. Reid denied making the comment that Dillon "needed to get his boy." Reid admitted to shooting May because May had shot him and was continuing to shoot him. Reid testified that he thought he was going to die, and he shot May out of necessity to defend himself and stay alive.

¶49. The defense rested. The jury-instruction conference was held in the trial judge's

chambers. To avoid repetition, the parties' arguments and the court's rulings made with respect to certain instructions will be addressed when the Court discusses Reid's assignment of error on this point.

¶50. After the jury instructions were read to the jury and the closing arguments were delivered, the jury deliberated and returned the following verdict: "We the jury find the Defendant, Jimmy Dale Reid, guilty of heat of passion manslaughter in Count 1. We the jury find the Defendant, Jimmy Dale Reid, guilty of possession of a weapon after felony conviction in Count 2." Reid's sentencing hearing was held on October 19, 2018, and on October 24, 2018, the trial court entered its sentencing order. Reid was sentenced to twenty years of incarceration for the manslaughter conviction and to a consecutive term of ten years for the felon-in-possession-of-a-firearm conviction.

¶51. Reid filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial on October 29, 2018, which the trial court denied on November 1, 2018. Reid appeals.

## DISCUSSION

### I. Refused Castle Doctrine Jury Instruction

¶52. Reid asserts that the trial court erred by refusing to give his proposed castle doctrine jury instruction D-12. That jury instruction provided:

> [Reid's] act of killing [May] is justifiable if [Reid] killed [May], while resisting [May's] attempt to unlawfully kill [Reid] or to commit a serious crime against [Reid] and while [Reid] was in his motel room.
>
> [Reid] is presumed to have reasonably feared death, great bodily harm, or a serious crime being committed against him if [May], was unlawfully and forcibly entering the motel room of [Reid]. This presumption does not apply if [May] had a right to be in the motel room or if [Reid] was committing a

19

criminal act.

> If you find from the evidence in this case that [Reid's] act of killing [May] was committed while resisting [May's] attempt to unlawfully kill [Reid] or commit a felony against [Reid] and while [Reid] was in his motel room, then you shall find [Reid] not guilty of murder.

We find no merit in this assignment of error, as addressed below.

¶53.    "It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Thomas v. State*, 75 So. 3d 1112, 1114-15 (¶9) (Miss. Ct. App. 2011) (quoting *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010)).

¶54.    Under Mississippi Code Annotated section 97-3-15(1)(f) (Rev. 2014), a homicide is justifiable "[w]hen committed in the lawful defense of one's own person . . . where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished[.]" The castle doctrine is codified under subsections (3) and (4) of this same statute, as follows:

> (3) A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, . . . if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, . . . or the immediate premises thereof . . . .  This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, . . . or the immediate premises thereof . . . or if the person who uses defensive force is engaged in unlawful activity . . . .

> (4) A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the

person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable.

Miss. Code Ann. § 97-3-15(3)-(4).

¶55. "Two prongs must be satisfied for the castle doctrine to apply. Under the first prong, the defendant must show three things: (1) he was 'where he had a right to be,' (2) he was 'not the immediate provoker and aggressor,' and (3) he was 'not engaged in unlawful activity.'" *Beal v State*, 225 So. 3d 1276, 1284 (¶20) (Miss. Ct. App. 2016) (quoting *Newell*, 49 So. 3d at 74 (¶22)). "If these conditions are met, then under the second prong, the defendant 'is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him,' if the jury finds any of the circumstances of 97-3-15(3) apply . . . ." *Id.* These circumstances include whether "the person is in his dwelling . . . or the immediate premises thereof, and the person against whom defensive force is used was in the process of unlawfully and forcibly entering the premises or attempting to remove another from such premises." *Id.*

¶56. During the jury conference, the trial judge refused Reid's castle doctrine jury instruction D-12, ruling that "[Reid] was committing a criminal act by having a gun in his hand in the first place[,] so I'm going to refuse [D-12]." Reid asserts that the trial court erred in doing so because to reach that conclusion, the court made two factual determinations that properly belonged to the jury.

¶57. First, according to Reid, because there was conflicting testimony over whether Reid actually had a weapon prior to shooting May, this factual determination belonged to the jury. In support of this argument, Reid cites *Bryant v. State*, 232 So. 3d 174 (Miss. Ct. App. 2017),

21

for the general proposition that "[i]n a homicide prosecution where the defendant asserts that the castle doctrine applies, and there are discrepancies in witness testimony, the issue is properly left to the jury." *Id.* at 179 (¶10).

¶58. In this case, Cotter, Dillon, and Brown testified that Reid had a weapon before the shooting. Reid, however, denied having a weapon beforehand, and Brown testified that she did not actually see Reid's handgun until he pulled it out when the shooting occurred. Thus, Reid asserts that *Bryant v. State* requires that the castle doctrine instruction should have been given because whether he was involved in an "illegal activity" is a question for the jury to decide.

¶59. Second, with respect to the point at which Reid shot May, Reid asserts that whether Reid "unlawfully" had a gun at that moment is also a jury question because "necessity" is a defense to felon-in-possession-of-a-firearm if the possession was "done to prevent a significant evil . . . there [was] no adequate alternative, and . . . the harm caused was not disproportionate to the harm avoided." *Flowers v. State*, 51 So. 3d 911, 913 (¶7) (Miss. 2010). Reid acknowledges that the trial court did allow a necessity jury instruction in his case with respect to his felon-in-possession charge, but he asserts that the issue of whether he was engaged in an "illegal activity" at the time of the shooting so as to eliminate his reliance on a castle doctrine jury instruction is a separate question that the trial court should have allowed the jury to decide.

¶60. The State, on the other hand, asserts that this Court need not reach the issue of whether the trial court erred by refusing the castle doctrine jury instruction because it found

22

that Reid was engaged in an "illegal activity." This is because, the State asserts, room 162 was not "a dwelling" as required under Section 97-3-15(3) in order for the castle doctrine to apply.

¶61. We find Reid's assignment of error without merit because our review of the record reflects that May (the victim) did not enter Reid's motel room—he was outside of the room in a common area. In *Beal v. State*, this Court recognized that "[t]he purpose of the castle doctrine is to allow a person to stand his ground against an intruder who is unlawfully trying to enter that person's home . . . ." *Beal*, 225 So. 3d at 1284 (¶22) (emphasis added). Thus, because we find no evidence that May "unlawfully tr[ied] to enter [Reid's hotel room]," *id*., we find that the castle doctrine would not apply under the circumstances in this case. Accordingly, we find no merit in this assignment of error.

## II. The Trial Court's Characterizing Pickering's Testimony as Hearsay and Giving a Limiting Instruction on that Testimony

¶62. Defense witness Brandon Pickering testified at trial that he relayed to Reid that May had told him a few weeks earlier that May was going to kill Reid. Reid asserts that the trial court erred when it characterized Pickering's testimony as hearsay and that the court further erred when it then gave a limiting instruction with respect to the testimony. We find this assignment of error without merit for the reasons set forth below.

¶63. As we recognized above, the giving of jury instructions, which includes limiting instructions, is within the discretion of the trial court, and, thus, we review this issue for abuse of discretion. *See Thomas*, 75 So. 3d at 1114-15 (¶9).

¶64. The record reflects that before Pickering testified, the defense sought a ruling out of

23

the presence of the jury on the State's anticipated objection that such testimony was hearsay.

After hearing the argument of counsel, the trial court concluded:

> [Because Mr. May] is not here, Mr. Pickering's testimony is hearsay testimony. I'm allowing that in, not for the purpose of giving veracity to what he is testifying to is true but only to the fact that he related an alleged conversation between him and Mr. May to Mr. Reid. And I will give the State a limited instruction on that. But I will let Mr. Pickering testify.

¶65.    Our review of the record reflects that defense counsel did not object to the giving of a limiting instruction with respect to Pickering's testimony.  As an initial matter, therefore, we find that this issue is procedurally barred.  *Anderson v. State*, 5 So. 3d 1088, 1095 (¶11) (Miss. Ct. App. 2007) (issue regarding adequacy of limiting instruction was procedurally barred where there was no contemporaneous objection).  Accordingly, "[t]o warrant reversal on an issue, [Reid] must show both error and a resulting injury."  *Weems v. State*, 63 So. 3d 579, 586 (¶25) (Miss. Ct. App. 2010).

¶66.    The trial court gave the following limiting instruction to the jury:

> Ladies and gentlemen the next witness that is proposed to give testimony in this case is going to testify about what is legally called hearsay testimony.  In other words, that someone allegedly said something to him. The him that I am referring to is Mr. May who is to have said that to him, this proposed witness. I am allowing it. It is hearsay and I am going to allow it into evidence not for the truth or veracity that Mr. May said that but that this witness did tell the Defendant about the alleged statement. And I have no way of knowing whether or not Mr. May, who is not here to testify, said that or did not say that. That is why it is hearsay testimony. The statements was made out of court and there is no way to verify that statement. But I am allowing it in . . . because this witness allegedly told that statement to the Defendant.  It is going to be hearsay testimony and you give it whatever weight that you think it should be given. That is up to you. But again I am allowing it in for the state of mind of this Defendant. And that is all. It is not for the veracity that Mr. May said that. I have no way of knowing that and neither do you. But that is why I am allowing it in. I am going to give you a written instruction that will basically

24

say the same thing to you at the end of the trial.

¶67. As his first point of error, Reid asserts that the trial court erred when it characterized Pickering's testimony as hearsay because it was not offered for the truth of the matter asserted. M.R.E. 801(c) ("'Hearsay' means a statement . . . offer[ed] in evidence to prove the truth of the matter asserted in the statement."). Reid further asserts that even if Pickering's testimony were hearsay, May's statement to Pickering was a "statement of [May's] then-existing state of mind" and thus was an exception to the hearsay rule pursuant to Rule 803(3) of the Mississippi Rules of Evidence.[2]

¶68. In response to this assertion, the State points out that even if the trial court was incorrect in characterizing Pickering's testimony as hearsay, the issue is "not significant" because Pickering's testimony was not excluded—Pickering was allowed to testify, and the jury heard his testimony. We agree, and we find that Reid was not prejudiced by the trial court's determination that Pickering's testimony was hearsay. *Weems*, 63 So. 3d at 586

---

[2] Rule 803 provides as follows:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

 . . . .

**Then-Existing Mental, Emotional, or Physical Condition**. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

M.R.E. 803(3) (italics omitted).

(¶25).

¶69.     Reid asserts as his second point of error, however, that the court's limiting instruction, which describes Pickering's testimony as "hearsay," was prejudicial because the implication exists that "hearsay" evidence is "sub-standard," has "low value," or is "not persuasive, *e.g.* 'That's just hearsay.'"  Reid further asserts that the court's instruction did not allow the jury to consider May's state of mind, but instead the instruction limited the jury to considering only Reid's state of mind.  Citing *Sims v. State*, 313 So. 2d 388, 389-90 (Miss. 1975), Reid asserts that "the jury had the right to consider" the evidence of May's threat "free of the court's comments, along with all the other relevant evidence, in determining" Reid's fate.

¶70.     We also find this contention without merit.  The trial judge told the jury that it could consider Pickering's testimony as it related to May's state of mind—evidence that directly relates to Reid's theory of self-defense.  *Sanders v. State*, 77 So. 3d 497, 506 (Miss. Ct. App. 2011) ("When a criminal defendant relies on a theory of self-defense and defense of others, he or she is of right entitled to offer evidence that the victim had previously and recently threatened the defendant.  This evidence is relevant on the issue of the defendant's state of mind.") (internal quotation marks omitted), *aff'd but criticized on other grounds*, 77 So. 3d 484 (Miss. 2012).

¶71.     In comparison, in *Sims v. State*, cited by Reid, the trial court instructed the jury about the significance of a car tag receipt, but the instruction ran directly counter to the purpose for which the car tag had been introduced.  *Sims*, 313 So. 2d at 390.  In effect, the court essentially negated the evidentiary value of the car tag receipt to the party introducing it.  *Id.*

26

Under these circumstances, the supreme court held that the trial court's remarks were so prejudicial so as to constitute reversible error. *Id.*

¶72.  We do not find the circumstances in this case are comparable to those in *Sims v. State*, or in any way constitute reversible error. Indeed, in reviewing the jury instructions as a whole, as we must, *Anderson*, 5 So. 3d at 1094 (¶11), we do not find that the trial court's limiting instruction, in the light of the other detailed jury instructions that the court subsequently gave to the jurors before they entered into deliberations, amounted to reversible error. These instructions told the jurors, more than once, "to consider and weigh the evidence"; explicitly reminded the jurors that it was their "exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose"; and "to determine what weight and what credibility will be assigned [to] the testimony and supporting evidence of each witness in this case." For these reasons, we find that Reid's second assignment of error without merit.

### III.  The Prosecutor's Questioning Regarding Reid's Knowledge of a Complaint May Filed Against Him

¶73.  Reid asserts that he is entitled to a new trial because the prosecutor was allowed to "cross-examine Reid with May's complaint" to the Warren County Sheriff's Department alleging that Reid had threatened May's family. Reid asserts that this "cross-examination" constituted inadmissible hearsay and was inadmissible other-bad-act evidence under Rule 404(b) of the Mississippi Rules of Evidence. For the reasons addressed below, we reject this assignment of error.

¶74.  In our review of the record, we find that the "cross-examination" on this issue

consisted of the following exchange:

> [THE STATE]:  Were you aware on or about that same day that Richard May had filed a report with the Warren County Sheriff Department that you had made threats against him?
>
> [REID]:  No, sir.

The only objection made by the defense after this question was, "Your Honor, I didn't think we could get into that about the social media."[3] The Court ruled, "It has been mentioned so go ahead."[4]

¶75.   First, we find that Reid is procedurally barred from raising this issue on appeal. Defense counsel did not object to the question regarding May's complaint on either hearsay or Rule 404(b) grounds—the two grounds he now raises on appeal. Because he did not make a contemporaneous objection on either of these grounds, Reid waived these grounds as a basis for appeal. In *Triplett v. State*, 264 So. 3d 808 (Miss. Ct. App. 2018), this Court

---

[3] Defense counsel's objection appears to imply that the trial court had made a prior ruling on the issue, but the trial court did not do so. Our review of the hearing on the Facebook post and May's filing with the Sheriff's Department reflects that the court reserved ruling on the issues, finding that they were "premature . . . I cannot allow [this evidence] in at this point through this witness. . . . But if there is other foundation information evidence presented later on we can always bring him back." In any event, defense counsel made no objections during that hearing; rather, the State was objecting to the Facebook posting on hearsay grounds.

[4] In response to defense counsel's objection, the prosecutor asserted that "counsel put this forth earlier and we have it in evidence." Based upon our review of the record, it appears that the prosecutor was referring to a facebook post by May that the defense had admitted into evidence as exhibit D-14 earlier during Reid's testimony, not to a complaint filed by May with the sheriff's department, which was not in evidence. Nevertheless, for the reasons addressed above, we do not find that the trial court committed reversible error in allowing the prosecutor to ask Reid whether he knew May filed a complaint about him with the Sheriff's Department.

refused to consider an issue raised for the first time on appeal, recognizing that "[i]t is well established that an objection on one or more specific grounds constitutes a waiver of all other grounds." *Id.* at 815 (¶25) (internal quotation mark omitted); *see Hughes v. State*, 90 So. 3d 613, 624 (¶26) (Miss. 2012) ("[A] motion for a new trial is not an opportunity to revive an issue which the party waived by failing to make a contemporaneous objection.").

¶76.   Second, we find that the jury heard testimony about numerous threats and ill-will between Reid and May.  As such, we do not find that the trial court's allowance of the single question regarding whether Reid was aware of May's complaint against him and Reid's "no, sir" response constitutes reversible error.

### IV.   The Sufficiency or Weight of the Evidence with respect to Reid's Manslaughter Conviction

¶77.   Reid asserts that his conviction and sentence for manslaughter should be reversed and rendered because the State failed to present sufficient proof to support this conviction. Alternatively, Reid asserts that the jury's guilty verdict for manslaughter was against the overwhelming weight of the evidence and should be reversed.  For the reasons addressed below, we find no merit in either assertion.  We therefore affirm Reid's manslaughter conviction and sentence in this case.

### A.   The Sufficiency of the Evidence

¶78.   "In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 275 So. 3d 100, 109 (¶28) (Miss. Ct. App. 2019).  In this regard, this Court "may only

29

reverse a denial of a [motion for judgment notwithstanding the verdict (JNOV)] when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.*

¶79. Section 97-3-35 defines manslaughter as follows: "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35. Reid asserts that under *Sloan v. State*, 368 So. 2d 228, 229 (Miss. 1979), he "is not required to prove that he acted in self-defense, and, if a reasonable doubt of his guilt arises from the evidence, including evidence of self-defense, he must be acquitted." According to Reid, the evidence presented by the State at trial was insufficient to prove that he did not act in self-defense.

¶80. In particular, Reid asserts that there were "multiple shooters" on the night of the shooting, there was no ballistic evidence concerning the shell casings found at the scene, there was no evidence to tie the bullets or fragments of bullets found in his arm to May's gun, and no way to know whether the .40-caliber magazine found at the front of the motel came from the gun that Reid was firing. According to Reid, without this information, there was insufficient evidence to even support an inference that he did not act in self-defense, or even whose gunshot actually killed May. Reid further asserts that in contrast to the State's lack of evidence, the evidence at trial was overwhelming that he *did* act in self-defense in the light of the testimony that Reid knew that May had threatened to kill him and that May and Acuff had asked about his whereabouts at the Battlefield Inn earlier that day.

30

¶81. It is true that Mississippi law provides that Reid does not bear the burden of proving self-defense at trial. A second principle, however, is equally true—that whether Reid acted in self-defense is a question for the jury: "As to a claim of self-defense, the jury is the ultimate judge of whether the defendant acted in a manner to justify self-defense." *Webster v. State*, 817 So. 2d 515, 519 (¶13) (Miss. 2002). In this regard, "the jury determines whether the defendant . . . acted in self-defense based on the testimony and evidence presented by counsel. This Court has restricted authority to interfere in the province of the jury verdict." *Id.* at 519 (¶14).

¶82. In this case, although Reid asserts that there were "multiple shooters," in our review of the record, we find that the evidence presented at trial ties a .22-caliber pistol to May—the gun that was found next to his body and the two spent .22-caliber casings found near May's body—and a .40-caliber handgun to Reid based on Dillon's testimony that Reid showed a .40-caliber handgun to him before the shooting, the finding of a spent .40-caliber casing inside room 162, and the finding of a .40-caliber handgun magazine at the front of the motel lobby. There was testimony that there were other people armed on the night of the incident and additional weapons in room 162, but we find no evidence tying any spent casings to weapons belonging to anyone else. Further, as explained by the State's forensic scientist, David Whitehead, although Reid, Rush, Acuff, and May all had gunshot residue on their hands, this did not necessarily mean that they had fired weapons—only that they had been where weapons had been fired.

¶83. As to the circumstances between May and Reid, we recognize that there was

testimony at trial that Reid knew that May had threatened to kill him, and that Reid knew that May and Acuff had asked about Reid's whereabouts at the Battlefield Inn on the night of the shooting. The record also reflects, however, that earlier that evening Reid had indicated that he was going to end the problem between himself and May that night;[5] that just before the shooting, Reid said something to Dillon that someone outside of room 162 was "messing with his girl [Cotter]"; and that there were threats going back and forth between May and Reid prior to that evening.

¶84. Further, the record reflects that although Reid testified that May and Acuff (and, according to Reid, a third, unknown person) were the aggressors when they came to room 162, Reid acknowledged in his testimony that they did not enter room 162. Additionally, although Reid testified that he did not fire until he had been shot twice and was running away, the evidence reflects that a spent .40-caliber casing was found inside of room 162. Also, although Reid testified that May and Acuff began shooting as soon as he opened the door, the record does not reflect that investigators found any bullet damage inside room 162.

¶85. Finally, although Reid asserts he acted in self-defense, we find that there was no evidence presented at trial that Reid attempted to alert law enforcement that evening about what he asserts happened to him. The record reflects that Reid fled the scene and hid until he was found four hours later. Reid testified that he crawled under a building on the property to hide and passed out until the police found him. The testimony at trial from law

_____

[5] As noted above, Brown testified that earlier in the evening of September 11, she heard Reid say to Dillon, "[Y]ou better get your boy, . . . or I'm going to end this s— tonight."

32

enforcement reflects that Reid was found hiding underneath a storage structure on the property about four hours after the shooting, and Reid was "conscious and speaking" when he was found. However, there was no testimony that Reid told law enforcement at that time what had occurred.

¶86. Reid relies upon *Lomax v. State*, 205 Miss. 635, 39 So. 2d 267 (1949), and *Bell v. State*, 207 Miss. 518, 42 So. 2d 728 (1949), to support his assertion that there was insufficient evidence for the jury to find that he did not act in self-defense. We do not agree. In both *Lomax v. State* and *Bell v. State*, the evidence was undisputed that the defendant acted in self-defense. *Lomax*, 205 Miss. at 639-42, 39 So. 2d at 268-69; *Bell*, 207 Miss. at 528-31, 42 So. 2d at 732-33.

¶87. In *Lomax v. State*, for example, Lomax had been previously threatened by her husband's female companion, and on the day in question Lomax shot the companion when Lomax saw that she had been out with her husband again. *Lomax*, 205 Miss. at 639-41, 39 So. 2d at 268. Lomax then called the police and explained the circumstances of the shooting. *Id.* at 641, 39 So. 2d at 268. The supreme court reversed Lomax's manslaughter conviction, finding that Lomax's testimony was reasonable, and "must be accepted as true . . . [where it was not] substantially contradicted in material particulars by a creditable witness or witnesses for the State, or by the physical facts or by the facts of common knowledge." *Id.* at 639, 39 So. 2d at 267-68; *see Bell*, 207 Miss. at 528-31, 42 So. 2d at 732-33 (reversing defendant's murder conviction, finding that the defendant's testimony explaining the homicide was essentially undisputed and showed, among other factors, that he had been

33

pursued for a day by the armed decedent, and was cornered when he finally had to resort to shooting at the decedent).

¶88. Indeed, in contrast to Reid in this case, who hid for four hours before he was found by police, Lomax called the police after the shooting, explained what had happened, and accompanied police to the crime scene. *Lomax*, 205 Miss. at 641, 39 So. 2d at 268. Further, unlike the circumstances in *Lomax* or *Bell*, Reid's account of what happened in this case is contradicted by the testimony of other witnesses and physical evidence. Viewing the evidence in the light most favorable to the prosecution, reasonable jurors could have found beyond a reasonable doubt that Reid had not acted in self-defense. *Webster*, 817 So. 2d at 519 (¶14); *Gillett v. State*, 56 So. 3d 469, 505 (¶102) (Miss. 2010) ("The jury determines the weight and credibility to give witness testimony and other evidence. This Court may not pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.") (citation and internal quotation mark omitted). We therefore find that the trial court did not err in denying Reid's JNOV motion.

### B. The Weight of the Evidence

¶89. In reviewing the same evidence and testimony addressed above, we also reject Reid's alternative argument that the trial court erred when it denied his motion for a new trial because the jury's guilty verdict for manslaughter was against the overwhelming weight of the evidence. "Appellate courts review a trial court's decision to deny a motion for a new trial utilizing an abuse-of-discretion standard of review." *Smith*, 275 So. 3d at 110 (¶35). In this regard, "[w]hen considering a challenge to the weight of the evidence, the verdict will

34

only be disturbed when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Pruitt v. State*, 122 So. 3d 806, 809 (¶6) (Miss. Ct. App. 2013)). Relevant to this analysis is the principle that it is the jury's role to assess the weight and credibility of the evidence. *Pruitt*, 122 So. 3d at 809 (¶8). Taking the evidence that supports the jury's verdict as true as outlined above and reviewing it in the light most favorable to the verdict, we find that allowing the jury's manslaughter verdict against Reid would not sanction an "unconscionable injustice." *Id.* at 809 (¶¶6-8).

¶90. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD AND C. WILSON, JJ., CONCUR. LAWRENCE AND McCARTY, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**